**RYLEY CARLOCK & APPLEWHITE**
One North Central Avenue, Suite 1200
Phoenix, Arizona 85004-4417
Telephone: 602/258-7701
Telecopier: 602/257-9582

John J. Fries – 007182
jfries@rcalaw.com
Andrew M. Kvesic – 024923
akvesic@rcalaw.com
Attorneys for Guaranty Bank and Trust Company

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

In re:

SAN MARCOS CAPITAL PARTNERS, LP,

Debtor.

Chapter 11 Proceedings

Case No. 2:11-bk-07144-GBN

**MOTION TO DISMISS, CONVERT OR APPOINT TRUSTEE UNDER CHAPTER 11**

Guaranty Bank and Trust Company ("Bank") moves the Court in the alternative to dismiss the case, convert it to Chapter 7 or appoint a trustee under Chapter 11 for cause. "Cause" exists under § 1112(b) of the Bankruptcy Code, for bad faith bankruptcy filing by San Marcos Capital Partners, LP ("Debtor"), substantial and continuing loss or diminution of the estate, the absence of any reasonable likelihood of rehabilitation, gross mismanagement of the estate, and unexcused failure to satisfy filing and reporting requirements. "Cause" exists under § 1104(a)(1) and (2) of the Bankruptcy Code based on the Debtor's fraud, dishonesty, and gross mismanagement of the estate by its principals and because it is in the best interest of Debtor's creditors and equity security holders.

I. **BACKGROUND**

The Bank is a secured creditor holding a deed of trust, assignment of rents and security interest in certain assets of Debtor, including the San Marcos Resort and Golf Course ("Resort"). In November 2004, the Debtor entered into a Loan Agreement ("Loan") with the Bank for the

1401682

acquisition of the Resort. The Bank thereafter modified the Loan four times. The Debtor has been in monetary default under the Loan since at least May 16, 2010, the Loan has fully matured and the current balance of the Loan exceeds $24 million.

In May 2007, under the Third Modification, the Debtor obtained $8,000,000 in additional financing from the Bank and used those funds to make capital distributions to its partners. Since making this distribution to its partners, the Debtor has invested very limited money to maintain, repair or renovate the Resort, and over the years parts of the Resort have fallen into a state of disrepair. The Resort has 47 casitas that have been shuttered for several years. The Debtor began to renovate the casitas in 2008, but after starting to renovate four of the casitas, quickly abandoned the effort. None of the casitas can be rented because of their decrepit condition. The Resort is in need of substantial capital improvements and Crowne Plaza has issued a "Property Improvement Plan" detailing substantial repairs and renovations needed for the Resort to retain the Crowne Plaza franchise.

In the Fourth Modification to the Loan ("Fourth Modification") [Ex. A], the Bank extended the maturity date of the Loan to May 16, 2010 and (i) the Debtor; (ii) the Debtor's general partner, San Marcos Resort Investors, LLC ("General Partner"); (iii) the managers of the General Partner, Jeff Witt, Joseph Witt, and Robert Bigelow; and (iv) the general manager of the Resort, Frank Heavlin, all agreed that there would not be any additional distribution of dividends, return of capital, or other distribution of cash to any partner, except under certain limited conditions that are not applicable here. The Debtor's Schedules and Statement of Financial Affairs ("Schedules") now reveal that each of those parties violated their covenant by having the Debtor distribute not less than $416,605 to the General Partner in the year prior to bankruptcy (Schedule 23, Ex. B), despite being in default of the Loan and the Resort being in desperate need of money. In contrast, and unaware that the General Partner was diverting funds from the Resort, the Bank infused $1.35 million into the Resort in the last nine months prior to the bankruptcy filing.

## II. THE DEBTOR MISLEADS THE BANK

In the summer of last year, Debtor claimed it was out of cash and needed money to keep

the Resort operational. Debtor's partners were unwilling to advance any new money and threatened to walk away from the Resort. Debtor requested emergency funding from the Bank to pay for operating expenses, including payroll. In the months that followed, Debtor's principals repeatedly contacted the Bank and represented that they were out of funds to operate the hotel [Ex. C-1 – C-4]. For example, in early August 2010, Jeff Witt e-mailed the Bank and represented that the Debtor would need $490,000 in expenses that needed to be paid by the next day, and another $500,000 by the following week [Ex. C-3].

### A. The Parties Enter a Protective Advance Agreement

On August 5, 2010, Debtor executed and delivered to the Bank a Protective Advance Agreement, under which Debtor represented that it needed $491,688.17 to pay operating expenses [Ex. D]. On August 5-6, 2010, the Bank advanced this exact amount to Debtor to cover Debtor's alleged cash shortfall.

At the same time the Debtor is representing to the Bank that it was short of cash, the General Partner was systematically siphoning money from the Resort to its General Partner. In the time leading up to the Protective Advance Agreement, Debtor diverted $10,000 to its General Partner on July 2, 2010, and $75,000 on August 3, 2010 [Ex. B]. On August 11, 2010, a few days after the Bank advanced $491,688.17, Debtor wired $104,000 to its General Partner [Ex.B].

The following month the Debtor told the Bank it needed money to meet payroll and on September 30, 2010, the Bank wired $117,409.13 for the Debtor's payroll. What Debtor failed to tell the Bank was that two days earlier, on September 28, Debtor transferred $180,000 to its General Partner [Ex. B]. Frank Heavlin, the Resort's General Manager, initiated the transfers to the General Partner.

Debtor, its General Partner, its managers and the general manager of the Resort intentionally misrepresented the Resort's cash position to the Bank. They knew that the Bank was relying upon the Debtor's representations that the Resort desperately needed money and threatened that it would be shut down if the Bank did not advance money. In fact, they knew and failed to tell the Bank that the Resort had an extra $400,000 in cash that the General Partner

was diverting to itself. They knew that the Fourth Modification specifically prohibited any distribution to the General Partner. Debtor and its General Partner were dishonest about the Debtor's financial condition because they knew the Bank would not fund the advances if Debtor had money available. They lied, hid the true cash position of the Debtor and breached their covenants in order to get money to the General Partner.

### B. Cooperation Agreement

On September 30, 2010, the Debtor, the General Partner, Jeff Witt, Robert Bigelow and Frank Heavlin each executed and delivered to the Bank a Release and Cooperation Agreement ("Cooperation Agreement") [Ex. E]. Under the Cooperation Agreement, the Debtor acknowledged its default under the Loan and stipulated to the entry of an order to appoint a Receiver to operate and manage the Resort ("Receivership Order," Ex. F-1). Two days before the Receiver took possession, the Debtor transferred the $180,000 from the Resort to the General Partner.

The Receivership Order (i) required the Debtor, its managers, agents, and employees, to immediately turn over to the Receiver all funds relating to the Resort or its operation and that were then or thereafter in Debtor's possession or control; and (ii) specifically provided that the Receiver could control any withdrawals or payments from any account funds belonging to or arising from Debtor's operations, **whether such accounts were titled in the name of Debtor or third-parties**. [Ex. F-2 at ¶2(j), ¶9]. The Receivership Order clearly captured the $180,000 that the Debtor transferred to its General Partner two days earlier. Debtor and its General Partner knowingly violated both the Cooperation Agreement and the Receivership Order by transferring the funds so they would not be at the Resort when the Receiver took possession and by failing to turnover the funds after the Receiver was appointed.

Even as they were hiding money from the Receiver and the Bank and transferring funds to the General Partner, Debtor and its agents were giving false written assurance to the Bank in the Cooperation Agreement:

> Borrower and Guarantor (each, a "Loan Party") hereby represent and warrant to Bank that, through the date hereof, and to such Loan Party's current actual knowledge, no Loan Party has made any

> written misrepresentation of material fact in any written disclosure, report, or other statement that is materially and adversely inaccurate, incomplete, or otherwise misleading. [Ex. E at ¶3].

As is now clear, each of the Debtor's representations that the Debtor was in need of money was "materially and adversely inaccurate, incomplete, or otherwise misleading.

### C. The Debtor Filed Bankruptcy in Bad Faith

Debtor, the General Partner, Jeff Witt, Robert Bigelow, and Frank Heavlin also agreed in the Cooperation Agreement that they would not contest the Bank's foreclosure of the Resort and would execute a deed-in-lieu of foreclosure upon the Bank's request [Ex. E at ¶8(d) – (e)]. The Bank relied on the Debtor's representations and advanced over $1.35 million to the Resort in a series of disbursements between August 2010 and January 2011. Debtor then breached its commitment in the Cooperation Agreement to provide a deed-in-lieu and instead filed bankruptcy and demanded the turnover of the Resort and the cash surplus that the Receiver had built up on the strength of the Bank's cash advances [Ex. G].

It is now apparent that Debtor, the General Partner, Jeff Witt, Robert Bigelow, and Frank Heavlin never planned to cooperate with the Bank and did not care whether they breached their covenants, misled the Bank, or diverted funds from the Resort. They wanted the Bank to advance money before the Debtor filed its bankruptcy. They engaged in a scheme to obtain money for the General Partner under false pretenses and then caused the Debtor to file Chapter 11 in bad faith.

### D. Defrauding Unsecured Creditors

The Debtor was also defrauding other creditors. The Debtor diverted its assets to the General Partner at a time when the Resort could not even pay its trade creditors or utility bills. The Debtor's Schedules reflect over $1.3 million in unsecured debts, not including the Bank's undersecured claim. The Debtor owed APS for unpaid utility bills prior to the appointment of the Receiver and APS threatened to shut off the power to the Resort. Bill Monk, a creditor of the estate, accuses the Debtor of mismanaging Debtor funds and suspects that the Debtor has misappropriated his $10,000 country club membership deposit that was supposed to be held in escrow [Ex. H]. Monk requested proof from the Debtor that these monies are still being held,

but Debtor has refused to answer or provide evidence that the money still exists. At a minimum, the fact that Debtor transferred over $400,000 to its General Partner while the Resort was desperate for cash is the gross mismanagement "cause" that requires a trustee to be appointed.

E. **The Bogle Property**

On September 24, 2010, approximately six months prior to the Bankruptcy filing, Frank Heavlin, as authorized signor of the General Partner, signed and recorded a General Warranty Deed (Ex. I) conveying the Debtor's real property adjacent to the Resort (generally known as the "Bogle Property") to the General Partner, apparently without any consideration.

In the Schedules, the General Partner claims that the Debtor conveyed the Bogle Property to the General Partner in trust for the benefit of the Debtor. The Warranty Deed does not reflect that the Bogle Property was transferred in trust. ARS 33-404.A provides that every deed in which the grantee is described as a trustee or acts as a trustee shall disclose the names and addresses of the beneficiaries for whom the trustee holds title and shall identify the trust or other agreement under which the grantee is acting. There was no reference to a trust, a trustee, any beneficiary or any trust agreement in the Warranty Deed. The failure to comply with the recording statute confirms the obvious: the Bogle Property was not transferred in trust for the benefit of the Debtor; it was transferred to the General Partner without consideration for the benefit of the General Partner.

The Biltmore Bank filed its Proof of Claim showing that it holds a deed of trust lien on the Bogle Property to secure a debt of $41,751. Attached to the proof of claim is a Change of Terms Agreements showing that the Biltmore Bank's lien was aggressively paid down from $223,647 after it was conveyed to the General Partner.

Equity interest holders also would be benefited by the appointment of a trustee. J.R. Witt, an equity security holder, accused the managers of Debtor's General Partner, including his own brother Jeff Witt, of violating their duties to the partnership by transferring Debtor's cash and real property to themselves [Ex. J]. Debtor transferred this property to its insiders to hinder, delay, and defraud other creditors and defraud their own partners.

### III. LACK OF DISCLOSURE AND FAILURE TO TURNOVER

In the Debtor's Schedules, the General Partner explains that of the $416,605 ("Insider Transfers"), $284,000 was being held for the benefit of Debtor to cover Debtor's expenses. If the monies were in fact held in some type of trust, they should have been deposited in a segregated account and not commingled with other funds of Debtor's General Partner. The General Partner provided no explanation as to the remaining $132,605 of Insider Transfers transferred to it, and in response to the disclosures required in the Schedules, indicated "To be provided."

The Bank has asked for a 1) complete and detailed accounting of the Insider Transfers; 2) any documents showing whether the Insider Transfers had been commingled with other funds of the General Partner or were otherwise designated in trust; 3) an accounting of any use of the funds; and 4) a demand for an immediate redeposit of the funds back into a debtor-in-possession account. The Bank received verbal information from the Debtor's counsel suggesting that the General Partner spent some of the money, including for funding of a $60,000 retainer to Debtor's counsel, and indicating that a detailed accounting will be provided. To date, the Bank has not received this additional information and has not received confirmation that any funds have been redeposited with the Debtor.

A creditor should not have to demand this information and the Debtor's failure to provide this information is grounds to dismiss the case or convert it to Chapter 7. The Debtor and its General Partner have a duty to disclose this information to the Court and creditors. The Schedules do not reflect the current value of the Debtor's interest in the funds held by the General Partner and it is unclear whether there is any "trust" money left. The Schedules specifically require that the Debtor disclose all financial accounts whether in the Debtor's name or are being held for the Debtor by someone else.

The Debtor's Schedules do not reflect any payments that the General Partner made on behalf of the Debtor from the Debtor's funds, so we do not know where the money went. By not answering these questions on the description and location of the account, creditors are not able

to serve discovery and find out for themselves where the funds were disbursed, and whether the funds were segregated in a separate account or commingled with other funds of the General Partner.

The General Partner prepared and signed the Debtor's Schedules and listed the General Partner as a **disputed,** unsecured creditor for $250,000. In response to the questions of when the debt was incurred, the consideration for the claim and whether the General Partner's claim is subject to a setoff, the General Partner simply indicates, "To be determined."

The General Partner clearly knows about the Insider Transfers, and now in the second month of the case, the Debtor has had ample time to provide the information. The Court can properly draw a negative inference that the Debtor and the General Partner do not want to disclose information on these sensitive, insider transactions under oath because the information would show that the transfers to the General Partner were fraudulent, without adequate consideration or are otherwise avoidable.

## IV. VIOLATION OF THE TURNOVER REQUIREMENTS OF THE BANKRUPTCY CODE

Ironically, while the Debtor has demanded that the Receiver turn over the Resort under § 543 of the Bankruptcy Code,[1] the Debtor's General Partner simply ignores it own duties under §§ 542 and 543 of the Bankruptcy Code to: 1) convey the Bogle Property back to the estate; 2) deposit the remaining cash from the Insider Transfers to the Debtor's bankruptcy estate; and 3) provide the Court a complete accounting of all monies the General Partner held for the benefit of the Debtor and receipts for any expenses paid from those funds. The General Partner does not want to return these assets to the Bankruptcy estate or subject them to the jurisdiction oversight and control of the Bankruptcy Court. A trustee should be appointed to investigate the General Partner's claims, to obtain a full and complete accounting of any assets held in trust, to recover

---

[1] The Bank recognized the obligation under the Bankruptcy Code and moved appropriately to excuse compliance under § 543(d).

the property conveyed, and seek a surcharge of the General Partner and those acting on behalf of the General Partner as may appear appropriate.

## V. CONFLICT OF INTEREST

The Debtor's pre-petition Balance Sheet dated as of September 30, 2010, reflects that the loan payable to the Capital Partners was $64,636.00 and reflects a net paydown during the year through credits of $120,363.00 [Ex K]. The Debtor's balance sheet also reflects an asset of $11,219,009.23, "due from Cap Partners." This balance sheet information is substantially different than the Debtor's Schedules, which do not reflect any amounts due from its capital partners and list the General Partner's disputed unsecured claim of $250,000.

The General Partner has an inherent and inescapable conflict of interest in analyzing these transfers and deciding whether to pursue (or settle) any claims that might exist against the insiders. Creditors would not have any confidence that any disclosure by the General Partner would be accurate or complete. Debtor's diversion of assets to Debtor's insiders are potentially voidable preferences and fraudulent transfers under §§ 544, 547 or 548 of the Bankruptcy Code. Monies owed by the capital partners should be collected for the estate. The disputed insider claims should be examined and objected to or resolved. An independent trustee must investigate these matters and report to the Court and the creditors and recover them for the benefit of creditors.

## VI. LEGAL BASIS TO CONVERT, DISMISS OR APPOINT A CHAPTER 11 TRUSTEE

Once cause has been shown Under Bankruptcy Code §§ 1104(a) and 1112(b), the Court shall dismiss a case, convert it to Chapter 7 or appoint a Trustee. The Court is given broad discretion to determine what is in the best interest of the estate. In this case, the Court can also decide to abstain from hearing the case under § 305 of the Bankruptcy Code in favor of the pending State Court Receivership if the interest of creditors and the debtor would be better served. *In re Uno Broadcasting Corporation*, 167 B.R. 189 (Bankr. D. AZ 1994); *In re Corporate and Leisure Event Productions, Inc.* 351 B.R. 724, (Bankr. D. AZ 2006)

(Recognizing the power to abstain in favor of a receiver, but declining to do so under the facts of those cases.)

In this case, dismissal may be the appropriate remedy. Since 2008, the Debtor has withdrawn substantial sums for its partners and has repeatedly failed and refused to advance new money to maintain and repair the Resort. More recently, it siphoned needed funds and other assets to its General Partner rather than pay the Bank, its unsecured creditors and utility bills. The Debtor promised the Bank to cooperate to entice the Bank to fund operations and then filed its bankruptcy in bad faith. It has no realistic prospects for a successful reorganization and has prohibitive conflicts with its General Partner and insiders that prevent the Debtor from performing its fiduciary duties. There is no equity in the Resort above the Bank's debt and the General Partners do not have the means or the desire to advance the funds to keep it operating and the golf course maintained during the long, hot summer months. Without funds, the Resort's condition and value will deteriorate.

The real economic stakeholder in the Resort is the Bank as shown by its continuing commitment to fund the Resort when the Debtor failed to do so. It is in the best interest of the Resort, its creditors, employees and the public that has enjoyed this iconic Resort since 1912 to dismiss the case or abstain in favor of the state court Receivership.

The Court could also convert the case to Chapter 7. The Bank has no objection to the conversion and recognizes that a Chapter 7 trustee could recover the insider transfers for the benefit of the unsecured creditors. However good the insider claims may be, the Bank does not know whether the trustee could recover from the responsible parties.

The Court could also appoint a Chapter 11 trustee. The Court shall order the appointment of a Chapter 11 trustee under the following circumstances:

> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after commencement of the case . . .; or
>
> (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

11 U.S.C. § 1104(a); *In re Bibo, Inc.*, 76 F.3d 256, 258 (9th Cir. 1996) (upholding court's *sua sponte* appointment of trustee where owner of Chapter 11 debtor siphoned money out of debtor's apartment complex by means of a kickback scheme).

A debtor-in-possession has the same role as a trustee where a trustee has not yet been appointed, including a fiduciary duty to the creditors. 11 U.S.C. § 1107(a); *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355 (1985). The concept of leaving a debtor-in-possession in control is based on the expectation that the managing employees can be trusted to execute the fiduciary responsibilities of a trustee. *Commodity Futures*, 471 U.S. at 355. If the debtor-in-possession fails to carry out those fiduciary responsibilities, section 1104(a) of the Bankruptcy Code mandates that a trustee be appointed to manage the debtor. *In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 526 (Bankr. E.D.N.Y. 1989).

### A. If Cause Is Shown, A Trustee is Required

The factors establishing "cause" are not limited to the fraud, dishonesty, or gross mismanagement enumerated in Bankruptcy Code § 1104(a)(1). *In re Intercat, Inc.*, 247 B.R. 911, 920-21 (Bankr. S.D. Ga. 2000). Courts have also considered the following factors in deciding whether to appoint a trustee for cause:

(1) Materiality of the misconduct;

(2) Evenhandedness or lack of same in dealings with insiders or affiliated entities vis-à-vis other creditors or customers;

(3) The existence of pre-petition voidable preferences or fraudulent transfers;

(4) Unwillingness or inability of management to pursue estate causes of action;

(5) Conflicts of interest on the part of management interfering with its ability to fulfill fiduciary duties to the debtor;

(6) Self-dealing by management or waste or squandering of corporate assets.

*Intercat*, 247 B.R. at 921.

Virtually all of the foregoing factors establishing cause exist in the present case involving Debtor. Debtor engaged in misconduct by depleting its cash on hand by transferring it to its

General Partner, then requesting emergency funding from the Bank based on purported cash-flow problems. Debtor hid money from the Receiver and the General Partner refuses to turn over money to the receiver in blatant violation of a state court order. The General Partner refuses to reconvey the Bogle Property to the Debtor. Debtor's diversion of money and assets to the General Partner prior to Debtor's bankruptcy filing is a potentially voidable preference and fraudulent transfer under §§ 547 and 548 of the Bankruptcy Code. It is unlikely that the managers of the General Partner would fulfill their fiduciary duties and pursue Debtor's pre-petition voidable transfers, because those same insiders were the recipients of the transfers and would risk losing the money to the creditors. *See In re Sharon Steel Corp.*, 871 F.2d 1217, 1228 (3d Cir. 1989) (current management unable to fulfill fiduciary duties to pursue pre-petition transfers because the debtor and the recipient of the funds had common ownership).

The correspondence from J.R. Witt confirms that he does not even trust his own brother to manage Debtor in good faith. Debtor's insiders are breaching their partnership authority and mismanaging Debtor's assets to protect the insiders' personal exposure under certain guaranty agreements, instead of preserving Debtor's assets for the bankruptcy estate. *See In re Tahkenitch Tree Farm P' ship*, 156 B.R. 525, 527 (Bankr. E.D. La. 1993) (finding that where debtor's management is acting its own behalf rather than that of debtor, sufficient "cause" exists to appoint a trustee under § 1104(a)(1)); *see also In re McCorhill Publishing, Inc.*, 73 B.R. 1013, 1017 (Bankr. S.D.N.Y. 1987) (debtor who made undocumented loans to its principals that were not repaid demonstrated a conflict of interest requiring the appointment of a trustee to protect creditors).

In sum, Debtor's General Partner cannot be trusted to carry out its required fiduciary duties, and a trustee must be appointed.

## B. A Trustee is in the Best Interests of Creditors and Equity Security Holders

The Court can also appoint a trustee when it "is in the interests of creditors, any equity security holders, and other interests of the estate." 11 U.S.C. § 1104(a)(2). Courts have considered the following factors in determining whether a trustee is appropriate under § 1104(a)(2):

> (i) the debtor's history of transactions with companies affiliated with the debtor;
>
> (ii) the debtor's failure to keep adequate records and to make prompt reports;
>
> (iii) the debtor's principal's actions in withdrawing substantial sums of money from the debtor and placing the funds in a related non-debtor business;
>
> (iv) acts of the debtor which are in wanton and reckless disregard of the financial reality of the business and its creditors.

*In re PMH Corp.*, 116 B.R. 644, 646 (Bankr. N.D. Ind. 1989) (citations omitted).

Here, Debtor displayed a pattern of making undisclosed pre-petition transfers of money to its General Partner with no explanation as to how these monies were used or whether the money still exists. The disclosures in Debtor's Schedules are deficient. Debtor is either hiding information, or its record keeping is so insufficient that it cannot even explain the purpose of certain withdrawals, noting in its schedules that an explanation is "To be provided." *See McCorhill.*, 73 B.R. at 1017:

> [W]here there are questionable inter-company financial transfers and the principals of the debtor occupy conflicting positions in the transferee companies, a trustee should be appointed in the best interests of creditors and all parties in interest in order to investigate the financial affairs of the debtor.

*See also Intercat*, 247 B.R. at 921 (debtor's systematic siphoning of assets to other companies under common control raised grave questions about its ability to act in the interest of creditors without a trustee in place). Unless a trustee is appointed, the Debtor may continue to deplete its assets in favor of its insiders and out of the reach of creditors.

## VII. CONCLUSION

Sections 1104(a) and 1112(b) require a Court to dismiss a case, convert it, or to appoint a trustee once "cause" has been established. The Debtor's management has provided many instances of fraud, dishonesty, misrepresentation, gross mismanagement, conversion, bad faith and looting of the Debtor before and after the filing.

Given the General Partner's pattern of misrepresentations to the Bank and defiance of the state court Receivership Order, the General Partner cannot be trusted to carry out its required fiduciary duties as debtor-in-possession. The case should be dismissed or alternative a trustee should be appointed to examine the questionable transfers to the General Partner, recover the Debtor's assets, and preserve the estate for the benefit of the creditors.

In this case, it does not appear that the creditors or the estate would be benefited by a continuation of the case in Chapter 11. There is only one heavily encumbered property that does not operate at break-even amount and does not have the ability to pay its real estate taxes, let alone cover any debt service. Incurring additional administrative expenses for a trustee would only increase the administrative burden on an overburdened Property.

Wherefore, the Bank requests entry of an order:

1) Dismissing the case,

2) Converting the case to Chapter 7, or

3) Appointing a trustee under Chapter 11,

DATED this 10th day of May, 2011.

RYLEY CARLOCK & APPLEWHITE

By _____
John J. Fries
Andrew M. Kvesic
Attorneys for Guaranty Bank and Trust Company

ORIGINAL electronically filed this 10th day of May, 2011, with:

U.S. Bankruptcy Court
District of Arizona
230 North First Avenue, Suite 101
Phoenix, Arizona 85003-1706

COPIES were served upon the following parties by First Class U.S. Mail and/or e-mailed on this 10th day of May, 2011, to:

Office of the U.S. Trustee
U.S. Bankruptcy Court
230 North First Avenue, Suite 204
Phoenix, Arizona 85003

Duncan E. Barber
Bieging Shapiro & Burrus, LLP
4582 South Ulster Street Pkwy, #1650
Denver, Colorado 80237
dbarber@bsblawyers.com
Attorneys for Debtor

Sean P. O'Brien
Gust Rosenfeld P.L.C.
201 East Washington Street, Suite 800
Phoenix, Arizona 85004-2327
spobrien@gustlaw.com
Attorneys for Debtor

L.J. Rotman
Hinshaw & Culbertson LLP
333 South Seventh Street
Suite 2000
Minneapolis, Minnesota 55402
LRotman@hinshawlaw.com
Attorneys for the Receiver

By: *Maureen A. Scott* (signature)
Maureen A. Scott

- 15 -